IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

LEONA M. BARKSDALE                                                    PLAINTIFF


V.                                         NO. 11-5136


MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration             DEFENDANT


**MEMORANDUM OPINION**


Plaintiff, Leona M. Barksdale, brings this action pursuant to 42 U.S.C. §405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying her claim for supplemental security income (SSI) benefits under the provisions of Title XVI of the Social Security Act (Act).  In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  See 42 U.S.C. §405(g).

I.      **Procedural Background:**

Plaintiff protectively filed her current application for SSI on June 20, 2005, alleging an inability to work since June 20, 2005, due to "Right arm up to your elbow, my arm goes numb. I have to wear a soft pad all the time.  Doctor requires."  (Tr. 85, 91).  An administrative hearing was held on March 12, 2009, at which Plaintiff appeared with counsel and testified.  (Tr. 572-

-1-

599).[1]

By written decision dated June 10, 2010, the ALJ found that during the relevant time period, Plaintiff had an impairment or combination of impairments that were severe - pain secondary to status post ulnar nerve transposition and de Quervain's[2] release.  (Tr. 15). However, after reviewing all of the evidence presented, the ALJ determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4.  (Tr. 16).  The ALJ found Plaintiff retained the residual functional capacity (RFC) to:

> perform unskilled light work as defined in 20 CFR 416.967(b) except that she is able to only occasionally push, pull, or reach overhead with her right arm.

(Tr. 16).  With the help of a vocational expert (VE), the ALJ determined Plaintiff could perform work as a cashier II; fast food worker; or inspector/tester.  (Tr. 21).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied that request on April 5, 2011.  (Tr. 4-6).  Also on April 5, 2011, in an Order of the Appeals Council, the council stated that it received and considered additional evidence which it made a part of the record.  (Tr. 7).  In its Notice of Appeals Council Action, the council stated:

> In looking at your case, we considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of

---

[1]A hearing was held on January 17, 2007, at which Plaintiff failed to appear.  The ALJ went forward with the hearing and issued a Notice to Show Cause for Failure to Appear.  (Tr. 59).  By letter dated February 22, 2007, Plaintiff's attorney sent documents to the ALJ which  indicated that Plaintiff's son had strep throat, and enclosed medical records confirming such.  (Tr. 61-64).  On May 8, 2007, the ALJ issued an unfavorable decision, noting that Plaintiff never responded to the Order to Show Cause.  (Tr. 39-48).   Plaintiff appealed the decision to the Appeals Council, and the Appeals Council remanded the case for further  proceedings.  (Tr. 66-70).  After the ALJ held the hearing on March 12, 2009, a supplemental hearing was held  on April 9, 2010.  (Tr. 600-620).

[2]de Quervain - painful tenosynovitis due to relative narrowness of the common tendon sheath of the abductor pollicis longus and the extensor pollicis brevis.  Dorland's Illustrated Medical Dictionary 539 (31st ed. 2007).

-2-

Appeals Council.  Your representative indicates that you have a severe
mental impairment.  However, as noted by the Administrative Law Judge,
the examining psychologist in November 2009 indicated that you gave
exaggerated responses during your examination (Exhibit 18F).  The
Administrative Law Judge also gave the mental assessment in Exhibit
12F little weight as this was not a treating source.  The Council concludes
that the weight of the evidence continues to support the Administrative
Law Judge's decision.  You have not provided a basis for changing the
Administrative Law Judge's decision.

(Tr. 4-5).  Subsequently, Plaintiff filed this action. (Doc. 1).  This case is before the undersigned

pursuant to the consent of the parties.  (Doc. 3).  Both parties have filed appeal briefs, and the

case is now ready for decision.  (Docs. 8, 9).

The Court has reviewed the entire transcript.  The complete set of facts and arguments

are presented in the parties' briefs, and are repeated here only to the extent necessary.

## II.   Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by

substantial evidence on the record as a whole.  Ramirez v. Barnhart, 292 F. 3d 576, 583 (8th Cir.

2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind

would find it adequate to support the Commissioner's decision.  The ALJ's decision must be

affirmed if the record contains substantial evidence to support it.  Edwards v. Barnhart, 314 F.

3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports

the Commissioner's decision, the Court may not reverse it simply because substantial evidence

exists in the record that would have supported a contrary outcome, or because the Court would

have decided the case differently.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  In

other words, if after reviewing the record, it is possible to draw two inconsistent positions from

the evidence and one of those positions represents the findings of the ALJ, the decision of the

-3-

ALJ must be affirmed.  Young v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity.  Pearsall v. Massanari, 274 F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§423(d)(3), 1382(3)(D).  A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant had engaged in substantial gainful activity since filing her claim; (2) whether the claimant had a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) met or equaled an impairment in the listings; (4) whether the impairment(s) prevented the claimant from doing past relevant work; and (5) whether the claimant was able to perform other work in the national economy given her age, education, and experience.  See 20 C.F.R. §416.920.  Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of her residual functional capacity (RFC).  See McCoy v. Schneider, 683 F.2d 1138, 1141-42 (8th Cir. 1982);  20 C.F.R. §416.920.

**III.   Discussion:**

Plaintiff raises two points on appeal: 1) The ALJ erred in rejecting Plaintiff's complaints

-4-

of disabling pain; and 2) The ALJ's decision is not supported by substantial evidence.  (Doc. 8).

**A.**     **Subjective Complaints and Credibility Analysis:**

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions.  See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole.  Id.  As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide."  Edwards, 314 F.3d at 966.

After reviewing the administrative record, it is clear that the ALJ properly evaluated Plaintiff's subjective complaints.  Plaintiff contends that her impairments were disabling.  However, the evidence of record does not support this conclusion.

By report dated May 19, 2008, Dr. R. Bryan Benefield, Jr., of Ozark Orthopaedics, reported that he performed an ulnar nerve transposition and deQuervains release on Plaintiff "many years ago." (Tr. 243).  Thereafter, Plaintiff began complaining in 2004 to her treating physician, Dr. Travis Embry, of upper extremity pain in her right arm.  (Tr. 149, 152-153).  On June 16, 2005, Plaintiff complained of chronic pain in her right upper extremity "seemingly secondary to an ulnar entrapment syndrome." (Tr. 144).  Dr. Embry reported that Dr. Benafield said there was not much he could do for it because Plaintiff had received nerve condition testing, and the EMG (electromyogram) was unable to identify any problems other than a regional pain

-5-

problem. (Tr. 144). Dr. Embry prescribed Methadone at that time. (Tr. 144).      On June 30,

2005, Dr. Embry reported that "This is a complicated case." (Tr. 143). He continued:

> Over the past five years she has had difficulty. She has had peripheral
> neuropathy secondary to an ulnar nerve impingement versus other type
> of neuropathic pain syndrome that has been undifferentiated very well
> other than we do know she has ulnar neuropathy probably secondary to
> previous trauma and postsurgical sequelae. She has tried Topamax,
> Neurontin, Elavil, Cymbalta, Effexor, Wellbutrin, Lexapro, Xanax,
> antiinflammatory medications, Tylenol, Ultram. We placed her on some
> Methadone and some Percocet protocol recently. She has had some mild
> relief, but she still has some problems....

(Tr. 143).

On July 22, 2005, non-examining physician, Dr. Stephen Whaley, completed a Physical

RFC Assessment, opining that Plaintiff could perform light work with limitations. (Tr. 154-

162).

On August 1, 2005, Plaintiff saw Dr. Embry, who noted that Plaintiff's right arm was

specifically very tender to the right forearm muscles, and "[p]osterior aspect on the ulnar aspect,

the usual sensitivity to the minimal touch." (Tr. 139). He noted that Plaintiff had full range of

motion, and reported that "It is highly subjective." (Tr. 139).

On September 21, 2005, a Physical RFC Assessment was completed by non-examining

physician, Dr. Alice Davidson, who opined that Plaintiff could perform light work with certain

limitations. (Tr. 165-173).      On October 4, 2005, Dr. Embry noted that Plaintiff had seen the

neurologist and orthopedist without a lot of benefit, and that the physical examination was

unchanged from previous: "highly subjective." (Tr. 216). On November 10, 2005, Dr. Embry

decided to refer Plaintiff to Dr. Ryan Kaplan, of Northwest Arkansas Neuroscience Institute.

(Tr. 214).

-6-

On November 14, 2005, a CT of Plaintiff's chest revealed no gross abnormality of the right upper extremity. (Tr. 223). On November 16, 2005, Dr. Embry noted that "[o]n discussion with Dr. Kaplan, he feels, after he shined his laser thermometer and she winced in pain that she has probably a psychosomatic phenomenon and is very unlikely to be an organic neurological pathology. As such, will respond appropriately when we see her again." (Tr. 213).

On December 2, 2005, Dr. Embry reported that none of Plaintiff's surgeries had been useful for her and that she "has been diagnosed as having some psychiatric problems as a possibility, as no other organic etiologies are identified and yet she persists to have trouble." (Tr. 212). Dr. Embry also reported that Plaintiff did not think she needed any counseling. (Tr. 212).

On March 8, 2006, Dr. Embry noted that Plaintiff seemed to be resistant to about every medicine he had ever tried. (Tr. 208). He reiterated that Plaintiff still was not willing to go through counseling or see a psychiatrist for biofeedback or alternative methods. (Tr. 208). In a report dated April 5, 2006, Dr. Embry again noted that Plaintiff's complaints were "highly subjective" and that oftentimes it seemed that the subjective complaints were out of proportion to the clinical examination. (Tr. 207).

On June 26, 2006, Dr. Embry completed a Physical RFC Questionnaire. He diagnosed Plaintiff with right arm regional pain syndrome, and reported that her prognosis was fair to poor. (Tr. 177). He opined that Plaintiff had severe enough pain to interfere with attention and concentration needed to perform even simple work tasks. (Tr. 178). Dr. Embry also found that Plaintiff could tolerate moderate stress; walk less than five city blocks without rest or severe pain; sit for two hours at one time before needing to get up; stand at one time for 1 hour before needing to sit down, walk around, etc.; stand/walk about 4 hours total in an 8-hour working day;

-7-

sit at least 6 hours total in an 8-hour working day(with normal breaks); walk 90 minutes during an 8-hour workday, for 5 minutes each time; would not need to take unscheduled breaks during an 8-hour working day; could frequently lift and carry 10 pounds or less; could occasionally lift and carry 20 pounds; rarely lift and carry 50 pounds; frequently look down (sustained flexion of neck); turn head right or left; look up; hold head in static position;  frequently twist, stoop (bend); crouch/squat; climb ladders and stairs; had significant limitations with reaching, handling or fingering; could spend zero percent of the time using her hands/fingers/arms of the right arm and hand and could use her left arm and hand 100 percent of the time.  (Tr. 178-181).    Dr. Embry also completed a Mental RFC Questionnaire on June 26, 2006.  (Tr. 183-187).  He diagnosed Plaintiff as follows: Axis I: history depression; Axis II: insomnia.  He listed prescribed medications as Cymbalta, Ambien, and Percocet, and gave her prognosis as fair to poor.  (Tr. 183).  He found Plaintiff had limited but satisfactory ability and aptitude to accept instructions and respond appropriately to criticism from supervisors; could get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes and deal with normal work stress;  and that her right arm always had pain and she was not able to use it.  (Tr. 185-187).

On September 6, 2006, Dr. Embry noted that the neurologist really did not have anything to add.  (Tr. 201).  Plaintiff saw Dr. R. David Cannon in September of 2006, upon referral by Dr. Embry, and in a letter to Dr. Embry dated September 11, 2006, Dr. Cannon reported that he told Plaintiff he really did not have any options for her other than to consider a tertiary referral center such as the Mayo Clinic.  (Tr. 190).  Plaintiff stated she had some financial difficulties doing that, but was going to explore all options.  Dr. Cannon stated that another option might be to consider a TENS trial.  (Tr. 190).  Dr. Cannon advised in a November 20, 2006 letter that he

AO72A
(Rev. 8/82)

would not fill out a physical RFC questionnaire.  (Tr. 189).

In an October 20, 2006 report, Dr. Embry noted that Plaintiff's MRI showed cervical disc impingement syndrome, which might be causing some of her pain, and noted that Plaintiff wanted to see the neurologist or neurosurgeon to have some sort of intervention.  (Tr. 197).

On February 21, 2007, Dr. Kaplan saw Plaintiff for a follow-up visit, noting that none of the neuropathic pain medications he had prescribed for her had helped.  He reported: "As you will recall, her neurologic examination was strongly suggestive of an underlying functional disorder as opposed to a true neurologic one." (Tr. 271).  Pursuant to Dr. Kaplan's suggestion, an MRI of Plaintiff's brachial plexus, with and without contrast, was performed on February 27, 2007, revealing:

> 1.  Chiari I malformation[3]
> 2.  Shallow right posterior disc protrusion at C5-8 which is more completely evaluated on MRI of the cervical spine of 10/06/06
> 3.  Normal MRI of the right brachial plexus.

(Tr. 269).

On March 6, 2008, Patricia Studer, PhD., of Ozark Guidance, Inc., saw Plaintiff, and diagnosed Plaintiff as follows:

| | |
|---|---|
| Axis 1: | Bipolar I last EP mixed unspecified |
| | With rapid cycling |
| | Primary diagnosis |
| | R/O with psychosis |
| Axis 2: | Borderline Personality Disorder |
| Axis 3: | Disc Disorder, Intervertebral, Cervical |
| | Also cervical cancer in remission, |
| | Impaired rt. Arm; cartilage out of knees |

---

[3]Chiari Malformation - Type I - involves prolapse of the cerebellar tonsils into the spinal canal without elongation of the brainstem.  It may be accompanied by hydrocephalus, spina bifida, syringomyelia, and mental defects. Called  also *Chiari deformity*.  Id. at 1113.

AO72A
(Rev. 8/82)

Axis 4:                    Occupational Problems
                           Economic Problems
Axis 5:                    Current Global Assessment of Functioning: 39

(Tr. 280-286).  Dr. Studer noted that Plaintiff reported she took 14 Valium right before

Valentines day and her boyfriend caught her and took them out of her mouth.  She then went to

sleep.  (Tr. 284).

On May 19, 2008, after Plaintiff continued to complain of pain in her right arm, Dr.

Benafield gave Plaintiff an injection, which did not help at all.  (Tr. 242-243).  Dr. Benafield

decided to obtain a repeat nerve conduction study and MRI of the shoulder.  (Tr. 242).  On June

25, 2008, an electrodiagnostic study was performed on Plaintiff's right upper extremity and was

normal.  (Tr. 245).  An MRI of the shoulder also proved to be unremarkable.  (Tr. 250).  Dr.

Benafield then referred Plaintiff to Dr. Kendrick for evaluation of her neck.  (Tr. 241).

On September 9, 2008, Plaintiff was admitted to Washington Regional Medical Center

for rib fractures and pneumothorax, as a result of an ATV collision that occurred while Plaintiff

was driving an ATV.  (Tr. 480-491).  The hospital report indicated that her extremities showed

no clubbing, cyanosis or extremity lymphadenopathy,[4] and that there was a full range of motion

of all joints without significant discomfort in the area.  (Tr. 494).

At the hearing held on March 12, 2009, Plaintiff testified that she had really bad problems

with her right arm, that her hand would "draw" back to her wrist and would go dead.  (Tr. 587).

She stated that she took Diazepam and Hydrocodone, with no side effects, but that they did not

help.  (Tr. 588-589).  She testified that she did housework step by step, cooked steaks, pork

chops, Hamburger Helper, and  "a little bit of everything."  (Tr. 592-593).  She picked up her

---

[4]Lymphadenopathy - Disease of the lymph nodes, usually with swelling; called also *adenopathy.*  Id. at1098.

skillet with her left hand and vacuumed with her left hand.  (Tr. 593-594).

On March 17, 2009, Plaintiff saw Dr. Robert Demski at Ozark Guidance, Inc., and Dr. Demski diagnosed plaintiff as follows:

| | | |
|---|---|---|
| Axis I: | Bipolar, mixed, unspecified; | |
| Axis 2: | Borderline PD | |
| Axis 3: | Cervical Ca, in remission;  cervical  vertebral pain;  "pinched nerve" and "knee problems" | |
| Axis 4: | Occupational and economic | |
| Axis 5: | GAF 41 | |

(Tr. 287-288).

On November 5, 2009, Patricia J. Walz, with Consulting Psychology of Western Arkansas, Inc., evaluated Plaintiff.  Dr. Walz noted that when Plaintiff walked from the waiting room into her office, Plaintiff exclaimed "ooh, ooh, ooh" as if in pain.  However, when she was observed walking in from the outside and back out to her car, she appeared to be much more lithe.  (Tr. 562).  Plaintiff told Dr. Walz she was out of all of her medication and took Ibuprofen for pain.  (Tr. 564).  Dr. Walz reported that Plaintiff's pain behavior was inconsistent.  Dr. Walz's office manager reported that when Plaintiff came in, she walked up the stairs easily and then when she checked in, she acted as if she could barely move or bend without exclaiming in pain.  (Tr. 565).  Dr. Walz reported that she noticed that when Plaintiff was distracted in her office, she did not exhibit pain behavior.  "She first acted as if she couldn't use her right hand at all.  She held onto it with her left hand.  Later she dug in her purse to get her glasses out and seemed to be using her right hand easily."  (Tr. 565).   Dr. Walz also administered the Computerized Assessment of Response Bias (CARB).  On the CARB, Dr. Walz reported there was indication that Plaintiff gave very poor effort.

-11-

> Her performance was in the range of persons making minimal effort or not attending to the task (random responding). Although when I checked on her she appeared to be working on the test in that she was whispering the number over and over. Her effort was far below that expected from either normal controls or person with frank brain impairment. It's extremely unlikely that even an individual who sustained a severe brain injury would perform this poorly in the absence of symptom exaggeration or malingering issue.

(Tr. 566). Given Plaintiff's poor performance on the CARB, Dr. Walz suspected that Plaintiff exaggerated her symptoms, and reported that her pain behavior was inconsistent. (Tr. 566). Dr. Walz diagnosed Plaintiff with:

| | |
|---|---|
| Axis I: | Adjustment disorder with depressed mood |
| | Polysubstance abuse in partial remission |
| Axis II: | R/O borderline intellectual functioning |
| | Borderline personality disorder |
| Axis V: | GAF - 55-60 |

(Tr. 566-567). Dr. Walz concluded that Plaintiff's social skills were impaired by her pull for sympathy and inconsistent pain behavior; that her speech was clear and intelligible; her intellectual functioning was thought to be in the 75 to 85 range; she was able to attend and sustain concentration; she persisted well; and the speed of information processing was within normal limits. (Tr. 567). Dr. Walz reported that Plaintiff did poorly on the CARB, which suggested exaggeration of symptoms or frank malingering. (Tr. 567).

In his decision, the ALJ found that Plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms were not credible to the extent they were inconsistent with his RFC. (Tr. 17). The ALJ discussed the medical records, and noted that in spite of Plaintiff's allegations of pain, there was no objective evidence to support them. He noted that Plaintiff continued to have full range of motion in her upper extremities, and the fact

-12-

that MRIs and nerve conduction studies revealed no explanation for Plaintiff's pain. The ALJ also addressed the inconsistent pain behavior displayed by Plaintiff, particularly noting Dr. Walz's observations, and the CARB test, which indicated Plaintiff exaggerated. The ALJ also noted that the fact that an ATV's throttle is on the right handlebar, requiring use of the right arm and hand for steering and throttle control, "belies the claimant's allegation that she is unable to use her right arm and hand." (Tr. 18).

The ALJ noted that Plaintiff told Dr. Walz that she was not taking anything for pain except Ibuprofen. "A claimant's allegations of disabling pain may be discredited by evidence that the claimant has received minimal medical treatment and/or has taken only occasional pain medications." Singh v. Apfel, 222 F.3d 448,452 (8th Cir. 2000). Finally, the ALJ noted that Plaintiff's work history showed that she only sporadically worked prior to the alleged disability onset date, "which raises a question as to whether the claimant's continuing unemployment is actually due to medical impairments." (Tr. 18). The ALJ found that Dr. Embry's physical RFC was not supported by medically acceptable clinical and laboratory diagnostic techniques, was not consistent with his own observations, and gave it very little weight. He gave Dr. Embry's Mental RFC Assessment no weight, as he is not a mental health expert. (Tr. 19).

The ALJ addressed Plaintiff's activities of daily living, noting that she was able to prepare meals, drive, shop, watch television, read, attend to her personal hygiene and grooming, and care for her two sons, although alleging difficulty with carrying out these activities. (Tr. 15).

The Court also notes that Plaintiff gave inconsistent statements as well. She had reported to Dr. Studer that she once tried to commit suicide by taking 14 Valium, but that her boyfriend caught her and took them out of her mouth. (Tr. 284). However, Dr. Walz reported that Plaintiff

-13-

indicated she took about 14 Diazepam because she got really depressed, and it knocked her out.
When asked if she went to the hospital, Plaintiff said "The guy I was seeing at the time never
took me."  (Tr. 563).

It is clear that the ALJ considered all of the relevant factors, and the Court believes that
there is substantial evidence to support the ALJ's credibility findings.

**B.     RFC Determination:**

RFC is the most a person can do despite that person's limitations. 20 C.F.R. §
404.1545(a)(1).  It is assessed using all relevant evidence in the record.  Id.  This includes
medical records, observations of treating physicians and others, and the claimant's own
descriptions of  her limitations.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005);
Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  Limitations resulting from
symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3).  The
United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual
functional capacity is a medical question."  Lauer v. Apfel,  245 F.3d 700, 704 (8th Cir. 2001).
Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical
evidence that addresses the claimant's ability to function in the workplace.  Lewis, 353 F.3d 642
at 646.  "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to
determine how those limitations affect his RFC."  Id.

In the present case, the ALJ considered the medical assessments of non-examining
agency medical consultants, Plaintiff's subjective complaints, and the medical records when the
ALJ determined Plaintiff could perform work at the light level with some limitations.

The Court is of the opinion that the record, as a whole, supports the ALJ's RFC, and that

-14-

the ALJ was warranted in giving Dr. Embry's mental RFC assessment no weight.  Plaintiff's

pain behavior was inconsistent with her own statements, and at the time of the hearing, she was

only taking Ibuprofen.

The Court believes there is substantial evidence to support the ALJ's RFC findings.

**C.  Whether the ALJ's decision is Supported by Substantial Evidence;**

Plaintiff argues that the ALJ's step 2 conclusion that Plaintiff's mental impairments are

non-severe is not supported by substantial evidence.  In his decision, the ALJ found that

Plaintiff's mental impairments of adjustment disorder with depressed mood, substance abuse

disorder, and borderline personality disorder, considered singly and in combination, do not cause

more than minimal limitation in the claimant's ability to perform basic mental work activities

and are therefore nonsevere.  (Tr. 15).

An impairment is severe within the meaning of the regulations if it significantly limits

an individual's ability to perform basic work activities. 20 C.F.R. § § 1520(a)(4)ii),

416.920(a)(4)(ii).  An impairment or combination of impairments is not severe when medical

and other evidence establish only a slight abnormality or a combination of slight abnormalities

that would have no more than a minimal effect on an individual's ability to work.  20 C.F.R. §

§ 404.1521, 416.921.  The Supreme Court has adopted a "de minimis standard" with regard to

the severity standard.  Hudson v. Bowen, 870 F.2d 1392, 1395 (8th Cri. 1989).  The ALJ

considered Plaintiff's activities of daily living, and found that Plaintiff had only mild limitations.

(Tr. 15).  He considered Plaintiff's social functioning, and found that Plaintiff had no limitations.

He considered Plaintiff's abilities in areas of concentration, persistence or pace, finding that

Plaintiff had mild limitations.  Finally, he found that Plaintiff had not experienced any episodes

-15-

of decompensation.   (Tr. 16).   The ALJ concluded that because Plaintiff's medically determinable mental impairments caused no more than "mild" limitations in any of the first three functional areas and "no" episodes of decompensation which have been of extended duration in the fourth area, they were nonsevere.  (Tr. 16).

As argued by Defendant, where a claimant's mental or personality problems do not result in a marked restriction of daily activities, constriction of interests, deterioration of personal habits, or impaired ability to relate, they are not disabling.  See Box v. Shalala, 52 F.3d 168, 171) (8th Cir. 1995).   In addition, Plaintiff did not allege in her application that she had a mental impairment, or raise the issue at the administrative hearing, which has been held to be significant.  See Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001)(holding that the fact that plaintiff did not allege that she was depressed in her application for benefits was significant). The Court finds there is substantial evidence to support the ALJ's finding that Plaintiff's mental impairments were non-severe.

### D.  Hypothetical Question to the Vocational Expert:

After thoroughly reviewing the hearing transcripts, along with the entire evidence of record, the Court finds that the hypotheticals the ALJ posed to the VE fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005).   Accordingly, the Court finds that the vocational expert's testimony constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude her from performing work as a cashier II; fast food worker; and inspector/tester.  Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996)(testimony from vocational expert based on properly phrased hypothetical question constitutes substantial

evidence).

**IV.    Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the Plaintiff benefits, and thus the decision should be affirmed.  The undersigned further finds that the Plaintiff's Complaint should be dismissed with prejudice.

DATED this 17th day of July, 2012.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)